LOIS JEAN NEIDERHISER, appellee, v. WILBERT VERNON NEIDER-HISER, appellant.

No. 50798.

(Reported in 119 N.W.2d 245)

David G. Bleakley and Harold D. Vietor, both of Cedar Rapids, for appellant.

George C. Claassen, of Cedar Rapids, and Carl F. Becker, of Mount Vernon, for appellee.

Peterson, J.—This is a divorce action decided in favor of plaintiff. The issues are: 1st: Defendant asks for new trial, and alleges the trial court abused its discretion in refusing to continue the case when defendant's attorney, with the court's approval, withdrew from the case in the middle of the trial. 2d: The trial court committed error in rendering a decree unfair to defendant as to support money for the four children of the parties.

On these issues defendant appealed.

I. Plaintiff and defendant were married January 10, 1951. Plaintiff was 28 and defendant was 39. They have four children who ranged in ages from 6 to 11 at time of trial in December 1961.

Defendant was a farmer. He rented and lived on a farm of 120 acres southeast of Cedar Rapids. In connection with the farm work defendant was exceedingly dilatory. He habitually refused to get out of bed in the morning until 10:30 or 11 o'clock. It became necessary for plaintiff to do all the chores in the morning. In addition thereto she worked regularly in the field. She continuously used a tractor and did much of the plowing, planting and harvesting of crops. At one time when she was six months pregnant with one of the children it became necessary for her to plant beans.

Another difficult part of the situation was defendant's cruel and inhuman treatment. He had an uncontrollable temper and on more than one occasion struck plaintiff. He once knocked her to the ground and pounded her face, arms and legs so hard that she was black and blue for a long period of time. After she realized that her life was in danger and that she could not take a chance of remaining with defendant, she left him and moved to her parents' home in a little town near Cedar Rapids called Ely. Later she rented a small house in Ely into which she moved with her children.

Plaintiff was only 17 when she married. She only reached eleventh grade in school, and did not secure an extensive education. She found a menial job at Mercy Hospital in Cedar Rapids at wages of $160 per month. She hired an elderly lady to take care of the children while she worked. It was necessary that she drive back and forth a few miles every evening and morning to perform her work.

Defendant's disposition was surly, quarrelsome and mean in all other personal contacts, as well as in the home.

Plaintiff thought defendant's actions denoted a serious mental and psychological condition. She filed an information against him before the Insanity Commission. After hearing, he was discharged. Later his brother and sister filed an information against him and he was committed to the State Hospital for a period of about 90 days. He was then discharged as normal. Because of this history and his general actions the two attorneys in the case decided he should be sent to the Medical Department at the University of Iowa for an examination prior to trial of the case. It was stipulated that the doctors making the examination should make a report direct to the trial court with a copy to each attorney. The report stated he was mentally and psychologically able to continue with the litigation and to defend himself in court.

It was very difficult for plaintiff to secure any assistance from defendant as to support money. Defendant also refused to let plaintiff have any of the household goods for herself and the children.

On hearing, the Judge divided the household goods between the parties and ordered payment of support money. Defendant announced he would hold a public sale of all personal property on the farm. He was dilatory in proceeding. The court finally appointed a receiver to sell the property.

The father and mother of defendant had recently departed this life, and their children, consisting of defendant, one other son, and one daughter, inherited the farm. Since defendant did not purchase their share and did not rent it again, it was rented to another tenant and it became necessary for defendant to vacate. During all this time, running over a period of approximately two years, defendant made continuous resistance to the trial of the divorce case. He had retained one attorney, Mr. Thomas L. Woods, who withdrew because defendant would not cooperate. Defendant then retained Mr. John Randall, an attorney of the Cedar Rapids Bar who represented him for several months.

This is a brief statement of the salient facts, as a background for consideration of the two issues in the case.

■ It has been recognized not only in this jurisdiction, but in many others, that a divorce case is peculiarly dependent upon the facts of the particular case. It is difficult to find two cases exactly alike. Each case must be considered and decided on the basis of the facts of the case under consideration. Black v. Black, 200 Iowa 1016, 205 N.W. 970; Klepper v. Klepper, 234 Iowa 1138, 15 N.W.2d 213; Bosveld v. Bosveld, 232 Iowa 1199, 7 N.W.2d 782. More facts relevant and material to the issues in this case will be outlined as the issues are considered.

II. After two attempts, in the course of almost two years, to get a trial of her case it was finally set for hearing on the morning of December 27, 1961. It appears that during the forenoon of said day the able attorneys for both plaintiff and defendant had been negotiating and working on a fair settlement between the parties, with special attention to the care of the children. There was never any controversy about the sufficiency of plaintiff's grounds for divorce, nor about plaintiff having custody of the children. ·

During the forenoon each attorney was consulting from time to time with his respective client. Between eleven and twelve o'clock they arrived at what they considered a fair adjustment of property rights. Plaintiff accepted the recommendation of her attorney. Defendant said he desired to talk to his aunt during the noon hour. This met with the approval of his attorney. However, between 1 and 1:30 p.m., defendant telephoned his lawyer that the settlement was not agreeable and that he would not accept or approve it. His lawyer advised him very clearly that it would be necessary for him to be in court in the case by two o'clock.

Defendant did not appear in court. Plaintiff, with her witnesses and her lawyer, was present, and ready for trial, for the third time since the case was started. By defendant's arbitrary action Mr. Randall was left without a client present in court. Defendant had refused to accept his recommendation. Mr. Randall made a lengthy statement to the court, emphasizing defendant's absence, and his actions about a possible settlement, and requested permission to withdraw as his attorney. Attorney for plaintiff also made a statement corroborating, as far as he knew, the difficulties encountered by Mr. Randall. We will state fully what took place in court, as revealed by the record:

"The Court: The Court grants permission of John D. Randall to withdraw from this case and if the Court feels it necessary to call upon Mr. Randall in further proceedings he will get in touch with him.

"Mr. Randall: Thank you, Your Honor, and with Your Honor's permission I will leave.

"(At this time Mr. Randall left the courtroom.)

"The Court: It is the further position of the Court and the Court makes a further ruling that this cause having been delayed for various reasons at various times, that the matter should proceed to hearing at the present time. As the file in this case shows, the original petition in this case was filed January 13, 1960, and that the Court makes a further finding that any delay in presenting this matter for hearing has not been the fault of the plaintiff but has been due to continuances granted the de-

fendant. So you may proceed to introduce your testimony, Mr. Claassen."

Plaintiff's testimony was then taken. At 3:45 p.m. the Defendant personally appeared in Court and the following record was made:

"(At this point Mr. Neiderhiser, the defendant, entered the courtroom.)

"The Court: You are Mr. Neiderhiser, aren't you?

"Mr. Neiderhiser: Yes.

"The Court: Just come up and sit down. I want to explain what is going on here. Let the record show that Mr. Neiderhiser, the defendant in this case, appeared in Court at quarter of four. Your attorney, Mr. Randall, has previously appeared in Court and has withdrawn from the case, and this case has been continued so many times that we are proceeding to a hearing at the present time.

"Mr. Neiderhiser: Well Mr. Woods is out of town today but he should be back tomorrow, maybe today.

"The Court: Of course Mr. Woods is the attorney I understand whom you had previously employed in this case and had discharged and employed Mr. Randall in his place, is that not correct?

"Mr. Neiderhiser: Yes, I have a right, I still have a right to hire another attorney.

"The Court: Mr. Neiderhiser, you have a right to hire an attorney, that is true. However, this case has been continued on several different occasions at the request of your counsel, and because of the length of time involved I felt that we were required, or at least justified to proceed to a hearing whether you had an attorney here or whether you didn't have an attorney here.

"Mr. Neiderhiser: I see.

"The Court: And the case has been filed for nearly two years and I regret that you were not able to be represented by counsel. But I think at the present time I will continue with this hearing and we will just have to see what develops; that is all.

798

"MR. NEIDERHISER: Well, could I be excused to use the phone for a minute?

"(At this time Mr. Neiderhiser left the courtroom.)

"MR. CLAASSEN: We will wait until he returns?

"THE COURT: Yes.

"(Recess—3:50 p.m. to 4:10 p.m.)

"THE COURT: The Court had a recess and it is now ten minutes after four, and Mr. Neiderhiser is back in the courtroom but without counsel. Do you wish to make a statement, Mr. Neiderhiser?

"MR. NEIDERHISER: Could I ask for a continuance until I may obtain counsel?"

Plaintiff's attorney made a statement at this point, reciting the troubles of plaintiff to secure hearing and stating that the case should be tried. Thereafter, the proceedings were as follows:

"MR. NEIDERHISER: May I say something, Your Honor?

"THE COURT: Yes.

"MR. NEIDERHISER: Mr. Woods will be back in the morning but he is not here today.

"THE COURT: One difficulty we have in this district at this time is the fact that two of the Judges are ill and are unable to hold Court. We have had outside Judges coming in to assist us; and I had this day set aside and I originally thought I could have all day tomorrow set aside to hear this case, but I find that the County Attorney has some business for me in Cedar County tomorrow morning. But I can be up here tomorrow afternoon. After that time my schedule is filled unless something comes up—I mean unless something is settled—until probably the 11th or 12th of January. Well, it is almost quarter after four today. I will continue the matter until 1:30 tomorrow afternoon, and we will proceed with as much evidence as we can get in at that time. * * * [Following statement was addressed to Mr. Neiderhiser.]

"THE COURT: If you will be present with your counsel tomorrow afternoon at 1:30 we will continue until that date.

"MR. CLAASSEN: But in the event he is not present with counsel, then what is to be the proceeding?

"THE COURT: Well, I expect to proceed with the trial

whether he is here with counsel or isn't here. With or without counsel. Yes, sir. And I might further state, Mr. Neiderhiser, that I expect to proceed and any motion for a continuance will be severely frowned upon. I won't say that I won't grant it under any circumstances, because I have had some experience along that line, but I hope to proceed to the trial of it.

"(Court was adjourned at 4:19 p.m. until 1:30 p.m. the following day.)"

Court convened the afternoon of December 28, 1961. The Defendant was not present, neither personally nor with or by counsel. The rest of plaintiff's evidence was then taken.

In order to carry out the orderly work of a court it is necessary that the trial court have some control over procedure. If either party in a case can ignore the wishes and work of a court it will only be a short time until we have utter chaos in our legal procedure.

A trial court has the right to control and conduct its court in an orderly, dignified and proper manner. It is not obli-gated on the basis of failure to be represented by counsel, to be subject to the whims, surliness, idiosyncrasies and indignity of litigant. 5 Am. Jur., Attorneys at Law, sections 39, 40; 45 A. L. R. 1142; 48 A. L. R.2d 1160; 53 Am. Jur., Trial, sections 24, 25 and 34.

The action of the trial court was not based altogether on the proceedings taking place on December 27 and 28. There was a history of two years of not only dilatory action on the part of defendant, but on affirmative violation of court orders and dis-regard and disrespect as to court procedure.

In the case at bar the trial court had knowledge on December 27 and 28 of the following delinquencies of defendant with reference to his actions: 1. He refused, and never ex-plained such refusal, to be present in the courtroom at one time when he was cited in contempt of court for failure to return the children after visitation, and in tearing out the ignition system of plaintiff's car. He was fined $50 by Judge Penningroth of the same district and ordered to restore the ignition in the car. 2. The instant case was set for trial two times before the District Court proceeded in this case to a hearing upon the merits.

It was set for hearing the first time on October 25, 1961, and plaintiff subpoenaed her witnesses for trial. At that time defendant's first attorney, Mr. Woods, withdrew from the case and it was continued to be assigned later. At the beginning of the September 1961 term the case was listed for dismissal if not tried in said term of court.

Defendant secured his new attorney, John D. Randall, thereafter and he filed answer December 18. It was then set for trial on December 19 and plaintiff subpoenaed her witnesses. On that date her attorney requested the psychiatric examination of defendant at Iowa City, to which plaintiff and her attorney agreed. It was then set for hearing on December 27 and plaintiff again subpoenaed her witnesses. The procedure as heretofore outlined then took place.

We hold the trial court did not abuse its discretion in the procedure followed. We approve the order of the court in denying a new trial.

III. The second question in the case at bar is whether or not the trial court erred in its decree as to support for the children of the parties.

Section 598.14, Code of Iowa, states:

"Alimony—custody of children—changes. When a divorce is decreed, the court may make such order in relation to the children, property, parties, and the maintenance of the parties as shall be right.

"Subsequent changes * * *."

 A divorce court may take into consideration whatever property both or either party owns in arriving at a proper division of the property between the parties, and especially in fixing a formula for the care and support of minor children. Here again the peculiar facts of each case have an important bearing on the matter. Davison v. Davison, 182 Iowa 1116, 165 N.W. 44, 45; Black v. Black, 200 Iowa 1016, 205 N.W. 970; Parizek v. Parizek, 210 Iowa 1099, 229 N.W. 689, 690; Brett v. Brett, 191 Iowa 262, 182 N.W. 241; Closz v. Closz, 184 Iowa 739, 169 N.W. 183, 185; Brannen v. Brannen, 237 Iowa 188, 21 N.W.2d 459, 462; Mitchell v. Mitchell, 193 Iowa 153, 185 N.W. 62.

This is particularly true as to the case at bar where the ages

of the children are such that they need many years of care before maturity. The record does not disclose the day and month of the children's birth, but stating the fact in years the following is now their approximate ages: John 12; Ralph 9; James 8 and Nancy 7.

In the instant case the following money was before the court in connection with fixing fees and to establish proper care and support of the four minor children: the money in the bank under attachment as proceeds of sale of the personal property, computing the interest to January 1, 1962, was $9081.50. It should be said in connection with the personal property that defendant surreptitiously sold some cattle and hogs after the receiver had been appointed to sell the personal property on the farm. Such sale by defendant was made in violation of an injunction granted against him. This was another deliberate action taken by defendant contrary to a court order. Plaintiff moved to have this money placed in the receivership fund. On a hearing as to the sale of the property in violation of the injunction Judge Penningroth found as follows: "That upon the trial of the case on its merits there shall be taken into account that he [defendant] had wrongfully procured this $4111.10 which had been received from the sale of animals and which had been attached and which he had sold in violation of an injunction. * * *."

The next item of money held under attachment pending final disposition of the case was a sum of $12,000 which had been distributed from the sale of the real estate by the referees. According to the record there still remained in the hands of the referees, after the distribution and after payment of about a dozen items of expense, the sum of $970.55. We find a small apparently unpaid claim filed in the partition action. Defendant was the owner of one third of such balance. His share in round figures would be $300. These items create a total fund before the trial court, for its consideration, of $21,381.50.

Under the decree of the trial court the following attorney fees and court costs were ordered paid: Carl F. Becker, one of the attorneys for plaintiff, $200; Thomas L. Woods, formerly

attorney for defendant, who had withdrawn from the case, balance of attorney fees, $427.15; John Randall, defendant's attorney, who also withdrew from the case, balance of attorney fees, $775; George C. Claassen, plaintiff's attorney, balance of attorney fees, $1300; court costs, $236.16; total, $2938.31.

After the decree and modification of decree were filed in January 1962, motion for new trial and amendment thereto were filed by defendant's new attorneys. These attorneys appear for defendant in this court. Plaintiff filed resistance to the motion and amendment. On January 31 the motion was overruled. Thereafter, application for modification of the decree and resistance were filed upon which order was duly made.

During the filing, hearing and orders upon these proceedings, plaintiff and defendant entered into a stipulation of settlement as to certain matters, which was signed by both plaintiff and defendant and by their present respective counsel of record. Under this stipulation it was ordered that money be paid out of the trust fund in following amounts: to defendant toward defraying expenses of procuring transcript, printing the record, and brief and argument in an amount not exceeding $300; to plaintiff to defray her expense of printing brief and argument in an amount not exceeding $100. The transcript and printing costs of defendant exceeded $300. We assume defendant paid the remainder. Plaintiff's printing cost amounted to only $70.

In the stipulation it was also agreed defendant should have the right to withdraw from the trust money the sum of $1399.31 principal and $22.39 interest to pay his 1960 federal income taxes.

It was further stipulated that a hospital bill at the University of Iowa in the amount of $650 should be paid from the trust funds. These additional items total $2441.70. There was paid out of the trust funds as itemized above a total sum of $5380.01, leaving a balance in January 1962 on deposit of $16,001.49. The trial court provided that there should be placed in the trust department of Merchants National Bank of Cedar Rapids the sum of $18,000 and that any balance remaining in the fund above said amount should be divided one half to plaintiff and

one half to defendant. After payment of all items allowed by the court this provision became meaningless.

As stated, supra, Judge Penningroth provided in his order, upon the application of plaintiff, to place $4111.10, proceeds of sale of personal property by defendant, in the receiver's account, the disposition of said item should be postponed until the case was tried on its merits. Ten months after he received this money defendant filed an application for payment of his 1960 income tax item out of the trust fund and alleged in the application he had no funds with which to pay the income tax. The trial court made no order as to this item in its final decree. Because he did contribute some ability and some work to accumulate the personal property, we will not order repayment made. He either has the item or has wasted it.

IV. Appellant complains about the trust fund being placed in Merchants National Bank without bond. This complaint is made in connection with appellant's argument that, in fact, the trial court placed defendant under guardianship. We do not consider defendant under guardianship, nor on the present state of the record is he required to have a guardian. Under section 598.14, supra, and decisions of this court heretofore cited, these funds, part of which in fact belong to plaintiff and part to defendant, were subject to the jurisdiction of the trial court in this action. The court had a right to fix the disposition of same for the benefit of either or both parties or the children. It was not necessary that defendant be placed under guardianship to accomplish this purpose.

Appellant alleges that, at any rate, the trust fund in the bank should be secured by a bond issued by a recognized bonding company. The trial court held a bond was not necessary and we approve this provision. The fund is deposited in Merchants National Bank of Cedar Rapids, Iowa. This is one of the larger banks in our state. It has capital stock of one million dollars; seven million dollars surplus; over one hundred thirteen million dollars in deposits; over twenty-five million dollars in cash and over forty million dollars in United States bonds. Deposits and savings in the bank are insured in the F.D.I.C. up to ten thou-

sand dollars. As a matter of gross assets and of net worth the bank is no doubt as safe as any bonding company which might be selected. Payment of bond premiums would be a waste of the children's money.

We will modify slightly the provisions of the trial court as to investment of the trust fund. The trustee may invest the trust money in municipal, state or federal bonds, always keeping in mind the best interest of the trust. It may, at its discretion, place not more than $10,000 in the savings department of the bank. We are assuming the bank will pay at least four percent interest on balances.

V. We will modify the decree of the trial court by fixing a small distribution to defendant. Only a modest amount can be paid because of the necessity of monthly payments for support of the children.

We hereby provide that $1500 be paid from the trust account to defendant. We do this with a certain amount of fear and trepidation. Defendant's record for judicious and careful expenditure of money is not good. As we read the history of his married life he was very dilatory in connection with his farming operations. In spite of defendant's delinquency the parties accumulated more than $13,000 worth of personal property on the farm. Defendant appropriated over $4100 of the money, leaving the balance, as heretofore shown, of $9081.50 in the trust account. We are allowing defendant this additional $1500 in the hope that if he did squander the $4100 he can start out now at 41 years of age and live a reasonably successful life, first to earn the support money decreed by the trial court and second to make a proper living and life for himself.

VI. The trial court fixed a support money payment by defendant to plaintiff through the office of the Clerk of the District Court of $80 per month for the seven summer months, from April through October, until John becomes 18 years of age; then $60 per month until Ralph becomes 18; then $40 per month until James becomes 18; then $20 per month until Nancy becomes 18. This starts out at an average of $46.66 per month for the year with a gradual reduction as above stated. We hold

this provision of the decree of the trial court is reasonable and fair and shall remain in force and effect.

In the figures we have heretofore shown, the trustee on or about January 15, 1962, had in its possession $16,001.49. We have provided that out of this sum there be paid to defendant the amount of $1500. We realize this diminishes the amount in the trust fund on behalf of the children, but it is also for the benefit of his children that he be rehabilitated with an opportunity to earn a living and the support money for his children.

This left a balance in the hands of the trustee in January of 1962 of $14,501.49. Under the temporary order of the District Court issued in the modification of decree in February 1962 the trustee was instructed to pay to the Clerk of the District Court of Linn County, toward support money for the children, the sum of $215 on the 15th day of each month during the pendency of this action in the Supreme Court. This means the trustee has paid out $2580 during 1962. This leaves a balance in the trust fund of $11,921.49. During the year the trustee has invested the balance on hand either in savings account or through purchase of bonds. There was at the end of 1962 some fees payable to the trustee. We estimate the dividends or interest less the fees of trustee has slightly increased the balance in the account. We assume defendant has paid his support money during the year in the amount of $560.

VII. It is necessary to simplify and modify the decree of the trial court as to payment of support money to plaintiff. We must approach the matter of support for the children from a realistic standpoint. It is elementary that there is no use allocating support money to be paid after the trust fund has been depleted.

If we read the trial court's decree correctly, it provides defendant's support money be paid by the Clerk to the trustee Merchants National Bank. The trustee is then to pay all support money into the office of the Clerk of the District Court. We cancel the step of payment of defendant's money by the Clerk to the trustee. It is an unnecessary gesture. The Clerk should pay it direct to plaintiff after it has been paid in by defendant.

We also desire to preserve, without question, the benefit of the provisions of law as to collection of support money from defendant by plaintiff so she can take action, if it becomes necessary, for its collection.

As we read the record under the decree of the trial court the trustee has paid during the past year $215 per month. The provision of the trial court is that this amount be paid per month for three years more. Then the item is to be increased to $260 per month until John is 18. This would be three years more at this rate. This would amount to $17,100 and would exhaust the trust fund in less than six years, leaving nothing to be distributed while Ralph, James and Nancy are reaching their respective ages of 18 years. We realize the money paid in by defendant of $560 per year should be considered, but it would not make sufficient difference to justify the amount fixed by the trial court. At any rate as a help to plaintiff and the children, we have held that hereafter defendant's money be paid to the Clerk and by the Clerk direct to plaintiff.

We hold it is better for plaintiff and the children that the trust fund be distributed toward their support on a basis running through the next eleven years, until Nancy becomes 18 years of age, than to distribute it in larger amounts in approximately one half of such time.

We modify the support decree of the trial court to provide that commencing January 15, 1963, the trustee shall pay to the Clerk of the District Court $125 per month from the years 1963 to 1968 inclusive; John will then be 18 years of age. For the years of 1969 and 1970, $100 per month, at which time Ralph will become 18. For 1971 and 1972, $75 per month. At this time James will become 18. In the year 1973 the sum of $50 per month on the 15th of each month. At the end of that time Nancy will become 18 years of age. This makes total payment by the trustee for support of the children of $13,800. All such payments shall be made by the Clerk to plaintiff, toward support of the children, on or about the 15th of each month.

We recognize this depreciates plaintiff's income for **herself** and her children in the crucial years just ahead. However, with

her earned income of $160 per month and this allotment of $125 per month and defendant's payments of $80 per month for seven months the amount totals $365 per month for seven months, with a smaller amount during the other five months. As the children become 18 years of age they can and no doubt will render valuable assistance to the family.

There will be some dividends or interest collected by the trustee through the years. This will depreciate fast as the support payments are made. There will be some fees in accordance with the modification of decree entered by the trial court, but on the basis we have set out above, and in view of the provision we will make hereinafter as to defendant, there will be sufficient in the fund to run through the remaining years. There may be a slight surplus at the end of the support payments in 1973. Under the decree of the trial court this surplus is to be paid to defendant. If plaintiff had appealed or if we were fixing this item in its inception we would have divided it equally between plaintiff and defendant. However, we cannot order a situation more favorable to plaintiff than as decreed by the trial court. We approve the percentage of fees to be paid the trustee, which percentage was apparently agreed to by the trustee. It is modest and very reasonable.

VIII. The trial court provided if defendant was sick, payments for his hospital expense could be made from the trust fund. The trial court also provided if defendant could not earn a living wage during the wintertime, under certain restrictions, payments could be made from the trust fund toward his living expenses. We are cancelling these provisions. It is an unknown factor which should not be paid out of the children's support money. Defendant is approximately 41 years of age. He is a strong able-bodied man. According to the report of the psychiatrist at the State University he has recovered from his slight mental aberrations. We are starting him out with a small nest-egg. There is no reason why he cannot support himself and pay the modest amount he is required to pay for the support of his children during the next ten years.

IX. The trial court provided defendant should have

the four children for visitation on Saturday of each month and that every other month he should have the right to take them on Saturday, keep them overnight, and return them to plaintiff on Sunday. On the basis of the complete record it is our conviction and holding that this visitation arrangement is more generous to defendant than it should be. Taking the welfare of the four children, and of both plaintiff and defendant, into consideration, we hold that defendant shall only have the children on every other Saturday. He shall get them at their home, and return them. The hours fixed in the decree of the trial court are reasonable and are approved.

X. Since there is no reference in the stipulation entered into between the parties and their present counsel, as to certain payments to be made and certain rights of the parties, we are assuming the cost of the transcript and the fees of the respective attorneys in the litigation in this court will be assumed personally by the two parties respectively. At any rate, we hold no further allowances as to the present litigation shall be made by the trial court from the trust fund.

Outside of the modifications we have provided herein, we approve and affirm all other provisions in the decree of the trial court. We provide the court enter supplemental decree in accordance with this decision.

The case is—Modified and affirmed.

GARFIELD, C. J., and HAYS, THOMPSON and SNELL, JJ., concur.

MOORE, LARSON, THORNTON and STUART, JJ., dissent.

MOORE, J. (dissenting)—I respectfully dissent to Divisions III through X of the majority opinion as to the disposition of property. By the provisions of section 598.14 it is the duty of the court to make such an order in relation to the property of the parties as shall be right.

The majority opinion gives part of the property to defendant and puts the balance in trust for the children. The result is

that plaintiff, without the slightest accusation of fault against her, is left penniless.

I would eliminate any trust provision and divide the prop-erty seventy-five percent to plaintiff and twenty-five percent to defendant. I would also require defendant to pay $80 per month child support.

I agree with the majority opinion regarding custody of the children and defendant's visitations.

LARSON, THORNTON and STUART, JJ., join in this dissent.